### FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **WILLIAM BENNER,** *et al.*,<br>               **Plaintiffs** | No. 1:20-cv-0775-JEJ |
| **v.** | Hon. John E. Jones, III |
| **THOMAS W. WOLF,** *et al.*,<br>               **Defendants** | *Complaint Filed 5/11/20* |

## DEFENDANTS' BRIEF IN OPPOSITION TO PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER

Respectfully submitted,

**JOSH SHAPIRO**
**Attorney General**

BY:  **KELI M. NEARY**
**Executive Deputy Attorney General**
**Director, Civil Law Division**

**KAREN M. ROMANO**
**Chief Deputy Attorney General**
**Chief, Civil Litigation Section**

**NICOLE J. BOLAND**
**Deputy Attorney General**

Office of Attorney General
15th Floor, Strawberry Square
Harrisburg, PA 17120
Phone: (717) 787-2717
kneary@attorneygeneral.gov
kromano@attorneygeneral.gov
nboland@attorneygeneral.gov

**DATE:  May 17, 2020**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................... iii

INTRODUCTION ................................................................................. 1

STATEMENT OF QUESTIONS INVOLVED ...................................... 3

ARGUMENT ........................................................................................ 4

   A.   PLAINTIFFS CANNOT ESTABLISH A LIKELIHOOD OF SUCCESS ON THE MERITS. ......................................................... 5

      1. The Pennsylvania Supreme Court Has Already Rejected Most Of Plaintiffs' Legal Theories. ................................................. 7

         a. Governor Wolf's Orders were a proper exercise of his police powers. ........................................................................ 8

         b. Plaintiffs' procedural due process rights were not violated because – as the Pennsylvania Supreme Court has already held – the present emergency required the state to act quickly. .................................................................... 12

         c. Plaintiff Nace did not suffer an unjust taking because his business' physical location was temporarily closed pursuant to the Governor's police powers ........................................... 18

         d. The Governor's Orders do not infringe on Plaintiffs' First Amendment Rights because the Orders are content-neutral and issued in furtherance of a substantial governmental interest. ................................................................... 21

         e. Plaintiffs cannot establish an Equal Protection violation because they are not similarly situated to any owners of life-sustaining business. ......................................................... 24

      2. Plaintiffs Cannot Establish A Likelihood Of Success On The Merits For Their Novel Legal Theories, Which Have No Bases In Law. ....... 27

         a. Plaintiffs have not presented a viable substantive due process claim. ................................................................... 27

         b. Plaintiffs are not entitled to payment for the use of their property under Pennsylvania law because it has not been taken for public use ......................................................... 31

i

      c. Plaintiffs' Guarantee Clause claim fails because such claims are solely committed to the judgment of Congress...............32

      d. The Governor's Order temporarily closing all schools does not violate freedom of religion because it does not prevent free exercise and is a neutral law of general applicability....33

      e. Plaintiffs' right to public education claim has no merit because children continue to be educated through virtual classrooms. ..........................................................................36

  B.   PLAINTIFFS CANNOT DEMONSTRATE THEY ARE LIKELY TO SUFFER IRREPABLE HARM IF RELIEF IS NOT GRANTED.............38

  C.   THE BALANCE OF THE HARMS AND THE PUBLIC INTEREST WEIGH AGAINST A TEMPORARY RESTRAINING ORDER.............41

CONCLUSION........................................................................................44

CERTIFICATE OF SERVICE ...............................................................46

CERTIFICATE OF PAGE COUNT.......................................................47

# TABLE OF AUTHORITIES

**Cases**

*Albright v. Oliver*, 510 U.S. 266, 273 (1994) ..........................................28

*Alvin v. Suzuki*,
    227 F.3d 107 (3d Cir. 2000)..............................................................13

*Amoco Production Co.,* 480 U.S., at 542, 107 S.Ct. 1396.......................41

*Ass'n of New Jersey Rifle & Pistol Clubs, Inc. v. Attorney Gen. New Jersey*, 910
    F.3d 106, 115 (3d Cir. 2018)........................................................6, 41

*Board of Regents of State Colleges v. Roth*, 408 U.S. 564, 577 (1972) .................29

*Bruni v. City of Pittsburgh*, 824 F.3d 353, 374-75 (3d Cir. 2016) .........................28

*Cafeteria and Restaurant Workers Union, Local 473 v. McElroy*,
    367 U.S. 886 (1961)...........................................................................17

*Carey v. Piphus*,
    435 U.S. 247 (1978)...........................................................................15

*City of Dallas v. Stanglin*,
    490 U.S. 19 (1989).............................................................................26

*City of New Orleans v. Dukes,*
    427 U.S. 297 (1976)...........................................................................21

*City of Renton v. Playtime Theatres, Inc.*,
    475 U.S. 41 (1986).............................................................................21

*Clark v. Cmty. for Creative Non-Violence*,
    468 U.S. 288 (1984)...........................................................................24

*Collins v. City of Harker Heights, Tex.*, 503 U.S. 115, 125 (1992)........................27

*Combs v. Homer-Center School District*, 540 F.3d 231, 242-43 (3d Cir. 2008) ....35

*Continental Group, Inc. v. Amoco Chemicals Corp.,* 614 F.2d 351, 359 (3d
        Cir.1980) ...............................................................................................38

*Corp. Synergies Grp.*, 775 F. App'x 54, 58 (3d Cir. 2019)..................................4, 5

*County of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998)....................................29

*Davenport v. USAA Cas. Ins. Co.*, No. 1:16-cv-2378, 2017 WL 3981369, at *3
        (M.D. Pa. June 2, 2017) ........................................................................4

*Desi's Pizza, Inc. v. City of Wilkes-Barre,*
        321 F.3d 411 (3d Cir. 2003)................................................................28

*District of Columbia v. Brooke,*
        214 U.S. 138 (1909)...............................................................................8

*Dombrowski v. Pfister,*
        380 U.S. 479 (1965).............................................................................39

*ECRI v. McGraw-Hill, Inc.*, 809 F.2d 223, 226 (3d Cir. 1987)..............................38

*Ellakkany v. Common Pleas Court of Montgomery Cnty.*, 658 F. App'x. 25, 27 (3d
        Cir. July 27, 2016).................................................................................4

*Employees v. Missouri Public Health & Welfare Dep't,* 411 U.S. 279, 294 (1973) .6

*Ferguson v. Skrupa*, 372 U.S. 726, 729-730 (1963)................................................29

*Friends of Danny DeVito v. Wolf,*
        68 M.M. 2020 (Pa. 2020)............................................................ passim

*Friends of Danny DeVito v. Wolf*, Docket No. 19-1265...........................................1

*Gilbert v. Homar,*
        520 U.S. 924 (1997)..............................................................................13

*Glasco v. Hills,* 558 F.2d 179, 181 (3d Cir. 1977) ..................................................38

*Goldblatt v. Town of Hempstead, N.Y.*,
  369 U.S. 590 (1962) ..................................................................................... 11

*Gonzales v. O Centro Espirita Beneficente Uniao de Vegetal*, 546 U.S. 418, 429
  (2006) ........................................................................................................ 6

*Hamilton v. Kentucky Distilleries & Warehouse Co.*,
  251 U.S. 146 (1919) ..................................................................................... 8

*Heffner v. Murphy,* 745 F.3d 56, 79 (3d Cir. 2014) ........................................... 30

*Hill v. Colorado*,
  530 U.S. 703 (2000) ............................................................................... 22, 24

*Hillsborough Cty. v. Automated Med. Laboratories, Inc.*,
  471 U.S 707 (1985) ..................................................................................... 8

*Hodel v. Virginia Surface Min. & Reclamation Ass'n, Inc.*,
  452 U.S. 264 (1981) ..................................................................................... 15

*Hohe v. Casey*,
  868 F.2d 69 (3d. Cir. 1989) .......................................................................... 39

*Hunterson v. DiSabato*,
  308 F.3d 236 (3d Cir. 2002) ......................................................................... 31

*Jacobson v. Massachusetts*,
  197 U.S. 11 (1905) ............................................................................ 9, 10, 12

*Johnson v. Ogershok*, No. 4:CV-02-1525, 2003 WL 24221182, at *2 (M.D. Pa.
  May 19, 2003) ............................................................................................ 5

*Johnson v. United States*,
  559 U.S. 133 (2010) ..................................................................................... 8

*Jones v. Barnes*,
  463 U.S. 745 (1983) ..................................................................................... 17

*Jones v. N. Carolina Prisoners' Labor Union, Inc.*,
   433 U.S. 119 (1977)........................................................................24
*Jones v. City of Phila.,* 890 A.2d 1188, 1215–16 (Pa. Cmwlth. 2006) .................37

*Keystone Bituminous Coal Ass'n v. DeBenedictis*,
   480 U.S. 470 (1987).......................................................................18

*Lane v. New Jersey*, 725 F. App'x 185, 187 (3d Cir. 2018) ....................................4

*Lawrence v. Texas*, 539 U.S. 558, 573-574 (2003) .................................................30

*Lawton v. Steele*,
   152 U.S. 133 (1894).......................................................................10

*Madison Square Garden Corp. v. Braddock*, 90 F.2d 924, 927 (3d Cir. 1937)........4

*Manigault v. Springs*,
   199 U.S. 473 (1905).......................................................................19

*Mathews v. Eldridge*,
   424 U.S. 319 (1976).......................................................................13

*Moore v. Mann*, No. 3:CV-13-2771, 2014 WL 3893903, at *2 (M.D. Pa. Aug. 7,
   2014) ........................................................................................38

*Morrissey v. Brewer*,
   408 U.S. 471 (1972).......................................................................13

*Nat'l Amusements Inc. v. Borough of Palmyra*, 716 F.3d 57 (3d Cir. 2013)...........20

*Norfolk S. Corp. v. Oberly*, 594 F. Supp. 514, 519 (D. Del. 1984) ..........................4

*Packingham v. North Carolina*,
   137 S. Ct. 1730 (2017)....................................................................22

*Pennhurst State School & Hospital, et al. v. Halderman, et al,* 104 S.Ct. 900, 919
   (1984) ........................................................................................6

*Pierce v. Soc'y of Sisters of the Holy Names of Jesus and Mary*, 268 U.S. 510, 534
   (1925) ........................................................................................35

*Punnett v. Carter*, 621 F.2d 578, 582 (3d Cir. 1980) ................................................4

*Ransom v. Marazzo*,
    848 F.2d 398 (3d Cir. 1988)................................................................................28

*Reilly v. City of Harrisburg*, 858 F.3d 173, 179 (3d Cir. 2017), *as amended* (June
    26, 2017) ..............................................................................................................5

*Reno v. American Civil Liberties Union*,
    521 U.S. 844 (1997)............................................................................................22

*Reno v. Flores*,
    507 U.S. 292 (1993)............................................................................................28

*Runyon v. McCrary*, 427 U.S. 160, 178 (1976)......................................................35

*Schlesinger v. Carlson*, 489 F. Supp. 612, 619 (M.D. Pa. 1980) .............................4

*Singer Mgmt. Consultants, Inc. v. Milgram*, 650 F.3d 223, 229 (3d Cir. 2011) .......6

*Sutton v. Cerullo*, No. 3:CV-10-1899, 2014 WL 3900235, at *5 (M.D. Pa. Aug. 8,
    2014) .....................................................................................................................6

*Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency*,
    535 U.S 302 (2002)............................................................................................19

*Tenafly Eruv Assoc. v. Borough of Tenafly*, 309 F. 3d 144 (3d Cir. 2002) .........5, 35

*United Artists Theatre Circuit, Inc. v. Township of Warrington, Pa.*,
    316 F.3d 392 (3d Cir. 2003)...............................................................................31

*Ward v. Rock Against Racism*,
    491 U.S. 781 (1989)............................................................................................21

*Washington State Department of Licensing v. Cougar Den, Inc.*,
    139 S.Ct. 1000 (2019) ..........................................................................................8

*Washington v. Glucksberg*, 521 U.S. 702, 720 (1997) ............................................27

*Whitmore v. Arkansas*,
   495 U.S. 149 (1990)..........................................................................26

*Williamson v. Lee Optical of Oklahoma, Inc.*,
   348 U.S. 483 (1955)..........................................................................24

*Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008)................................42

**Constitutional Provisions**
U.S. Const. amend. I ..........................................................................21
U.S. Const. Amend. X..........................................................................9
U.S. Const. amend. XIV, § 1 ..........................................................................29

**Statutes**
2 Pa.C.S. § 702..........................................................................17
2 Pa.C.S. § 704..........................................................................17
35 Pa.C.S.A. §7313(10) ..........................................................................32
42 U.S.C. § 1983..........................................................................37
5 U.S.C. § 702..........................................................................17

**Other Authorities**
Thomas Wm. Mayo, Wendi Campbell Rogaliner, and Elicia Grilley Green, "'To
   Shield Thee From Diseases of the World': The Past, Present, and Possible
   Future of Immunization Policy," 13 J. Health & Life Sci. L. 3, 14 (Feb. 2020)...9

Thomas Wm. Mayo, Wendi Campbell Rogaliner, and Elicia Grilley Green, "'To
   Shield Thee From Diseases of the World': The Past, Present, and Possible
   Future of Immunization Policy," 13 J. Health & Life Sci. L. 3, 9 (Feb. 2020)...10

U.S. Supreme Court closing its building to the public until further notice,
   https://www.supremecourt.gov/announcements/COVID-19.aspx ......................12

U.S. Supreme Court Press Release detailing how the Court will hear May
   arguments telephonically,
   https://www.supremecourt.gov/publicinfo/press/pressreleases/pr_04-13-20......12

http://archphila.org/archbishop-nelson-j-perez-announces-the-suspension-of-all-
   public-masses-in-the-archdiocese-of-philadelphia-effective-at-noon-tomorrow/
   (3/17/20)..........................................................................34

https://www.governor.pa.gov/newsroom/gov-wolf-12-more-counties-to-move-to-
yellow-phase-on-may-22/ .....................................................................................40

https://www.governor.pa.gov/newsroom/gov-wolf-announces-reopening-of-24-
counties-beginning-may-8 ...................................................................................40

"State Data and Policy Actions to Address Coronavirus," Kaiser Family
Foundation, https://www.kff.org/health-costs/issue-brief/state-data-and-policy-
actions-to-address-coronavirus/ (last visited 5/1/20)..........................................11

All Non-Life-Sustaining Businesses in Pennsylvania to Close Physical Locations
as of 8 PM Today to Slow Spread of COVID-19,
https://www.governor.pa.gov/newsroom/all-non-life-sustaining-businesses-in-
pennsylvania-to-close-physical-locations-as-of-8-pm-today-to-slow-spread-of-
covid-19/ (3/19/20). ...........................................................................................43

Steven Marroni, et al., "Protest of Gov. Wolf's coronavirus shutdown at Capitol:
Recap," PennLive.com, https://www.pennlive.com/news/8d1601-protest-of-gov-
wolf-s-coronavirus-shutdown-at-capitol-live-updates.html (last visited 4/28/20)
.............................................................................................................................23

# **INTRODUCTION**

In bringing this suit to enjoin the Governor's actions, Plaintiffs are attempting to collaterally attack recent rulings from both the United States and Pennsylvania Supreme Courts.[1] Both of those Courts denied an injunction request that was largely duplicative of the current matter and contained nearly all of the same constitutional challenges to the Governor's actions (with limited exceptions as detailed below).[2] Both full Courts denied the injunction.[3] This Court should do the same.

On March 6, 2020, Governor Wolf declared a disaster emergency in the Commonwealth of Pennsylvania. On March 19, 2020, the Governor entered an Executive Order directing all non-life-sustaining businesses in Pennsylvania to temporarily close their physical locations so that those businesses would not serve as centers for contagion. The Supreme Court of Pennsylvania unanimously agreed

---

[1]     In reaching its conclusion, the Pennsylvania Supreme Court relied primarily on rulings of the United States Supreme Court to apply well-established principles of federal law. *Friends of Danny DeVito v. Wolf*, __ A.3d. __, 2020 WL 1847100 (Pa. April 13, 2020).  *See also, Doc. 1-2.*

[2]     Applicants initially incorrectly styled their request for relief in the United States Supreme Court as a stay. They subsequently corrected their error, making clear to the Court that they were seeking an injunction.

[3]     The Petition for Writ of Certiorari continues to be litigated by opposing counsel in the United States Supreme Court. *Friends of Danny DeVito v. Wolf*, Docket No. 19-1265.

that the Governor, under Pennsylvania law, had the authority to enter the Executive Order, that the Order was a lawful exercise of Pennsylvania's police powers, and that the Order did not violate state or federal constitutional rights. *Friends of Danny DeVito v. Wolf*, __ A.3d. __, 2020 WL 1847100 (Pa. April 13, 2020). Because of the Governor's actions, Pennsylvania slowed the spread of the virus and reduced its death toll.

Despite this, Plaintiffs still seek to enjoin the Governor of Pennsylvania's emergency declaration, to reverse the closure of non-life-sustaining businesses, to lift the suspension of in-person education, and to override the stay-at-home directive. They raise these challenges only weeks after nearly identical claims failed in both the Pennsylvania and United States Supreme Courts.

Yet, nothing has changed. Plaintiffs' contentions, which are heavy on hyperbole and anti-science but light on legal analysis, largely parrot the arguments presented in *Friends of Danny DeVito*. The only new claims – substantive due process, guarantee clause, and right to public education – fail as a matter of law. There is no support in fact or law for entering a restraining order. To the contrary, the highest state court has already approved the Governor's emergency declaration and the highest federal court did not find any urgency necessitating an injunction. This Court should find likewise and deny Plaintiffs' request for a restraining order.

## <u>STATEMENT OF QUESTIONS INVOLVED</u>

A. CAN PLAINTIFFS ESTABLISH A LIKELIHOOD OF SUCCESS ON THE MERITS?

   *Suggested Response:*        *No.*

B. CAN PLAINTIFFS ESTABLISH A LIKELIHOOD OF IRREPARABLE HARM?

   *Suggested Response:*        *No.*

C. DO THE BALANCE OF THE HARMS AND THE PUBLIC INTEREST WEIGH IN FAVOR OF PLAINTIFFS?

   *Suggested Response:*        *No.*

# **ARGUMENT**

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Corp. Synergies Grp., LLC v. Andrews*, 775 F. App'x 54, 58 (3d Cir. 2019).[4] "It has been well stated that upon an application for a preliminary injunction to doubt is to deny." *Madison Square Garden Corp. v. Braddock*, 90 F.2d 924, 927 (3d Cir. 1937). Indeed, "[t]here is no power . . . which requires greater caution, deliberation, and sound discretion, or more dangerous in a doubtful case, than the issuing [of] an injunction; it is the strong arm of equity, that never ought to be extended unless to cases of great injury[.] . . . ." *Norfolk S. Corp. v. Oberly*, 594 F. Supp. 514, 519 (D. Del. 1984).

"Generally, a temporary restraining order or preliminary injunction is issued to maintain the status quo." *Schlesinger v. Carlson*, 489 F. Supp. 612, 619 (M.D. Pa. 1980). Here, Plaintiffs seek to upend it. Where the requested preliminary injunctive relief "is directed not merely at preserving the *status quo* but . . . at providing mandatory relief, the burden on the moving party is particularly heavy."

---

[4]   "Courts apply one standard when considering whether to issue interim injunctive relief, regardless of whether a plaintiff requests a temporary restraining order ("TRO") or preliminary injunction." *Davenport v. USAA Cas. Ins. Co.*, No. 1:16-cv-2378, 2017 WL 3981369, at *3 (M.D. Pa. June 2, 2017) (J. Jones) (citing *Ellakkany v. Common Pleas Court of Montgomery Cnty.*, 658 F. App'x. 25, 27 (3d Cir. July 27, 2016)).

4

*Punnett v. Carter*, 621 F.2d 578, 582 (3d Cir. 1980); *see also Lane v. New Jersey*, 725 F. App'x 185, 187 (3d Cir. 2018).

Plaintiffs have the burden of proving: "(1) likelihood of success on the merits; (2) likelihood of irreparable harm to the movant in the absence of relief; (3) balance of the harms between the plaintiff on the one hand and the defendants on the other; and (4) public interest considerations." *Corp. Synergies Grp.*, 775 F. App'x at 58. The movant must establish the likelihood of success on the merits of its causes of action and the likelihood that it will suffer irreparable injury if the requested relief is not granted before the court can even consider public interest and the balance of hardships. *Tenafly Eruv Assoc. v. Borough of Tenafly*, 309 F. 3d 144 (3d Cir. 2002); *Reilly v. City of Harrisburg*, 858 F.3d 173, 179 (3d Cir. 2017), *as amended* (June 26, 2017). "The power to issue a temporary restraining order or an injunction should be used sparingly and relief should not be granted except in those rare instances in which the law, the facts, and equities are clearly in the moving party's favor." *Johnson v. Ogershok*, No. 4:CV-02-1525, 2003 WL 24221182, at *2 (M.D. Pa. May 19, 2003).

Plaintiffs cannot satisfy any element requisite to obtaining injunctive relief, nor do the equities weigh in their favor. Their motion must be denied.

### A.   PLAINTIFFS CANNOT ESTABLISH A LIKELIHOOD OF SUCCESS ON THE MERITS.

"To establish a reasonable probability of success on the merits, the moving party must produce sufficient evidence to satisfy the essential elements of the underlying cause of action." *Sutton v. Cerullo*, No. 3:CV-10-1899, 2014 WL 3900235, at *5 (M.D. Pa. Aug. 8, 2014); *see also Singer Mgmt. Consultants, Inc. v. Milgram*, 650 F.3d 223, 229 (3d Cir. 2011). The burdens of proof as to the substantive merits of a claim "track the burdens at trial." *Gonzales v. O Centro Espirita Beneficente Uniao de Vegetal*, 546 U.S. 418, 429 (2006). A failure to establish a likelihood of success on the merits "necessarily result[s] in the denial of a preliminary injunction." *Ass'n of New Jersey Rifle & Pistol Clubs, Inc. v. Attorney Gen. New Jersey*, 910 F.3d 106, 115 (3d Cir. 2018).

Here, Plaintiffs cannot establish that they are likely to succeed on the merits on any of their claims. The Supreme Court of Pennsylvania has already determined that the power vested in the Governor by the Pennsylvania General Assembly was "firmly grounded" in the Commonwealth's inherent police power to promote public health and safety, and that the protection of millions of Pennsylvanians from a deadly pandemic was the "sine qua non of a proper exercise of police power." *Friends of Danny DeVito*, at 20, 27-29.

Moreover, it is well settled that "an unconsenting State is immune from suits brought in federal courts by her own citizens as well as by citizens of another state." *Employees v. Missouri Public Health & Welfare Dep't,* 411 U.S. 279, 294 (1973).

No basis of jurisdiction, including pendant jurisdiction, may override the Eleventh Amendment.   *Pennhurst State School & Hospital, et al. v. Halderman, et al,* 104 S.Ct. 900, 919 (1984).   In *Pennhurst,* the U.S. Supreme Court considered the application of the Eleventh Amendment in claims brought against state officials and held "a claim that state officials violated state law in carrying out their official responsibilities is a claim against the State that is protected by the Eleventh Amendment."   *Id.* at 903.

Plaintiffs' new challenges present no basis for overturning this ruling and have no merit as a matter of law. Therefore, Plaintiffs' motion for a restraining order must be denied.

1. **The Pennsylvania Supreme Court Has Already Rejected Most Of Plaintiffs' Legal Theories.**

Plaintiffs claim support for several of their arguments in the Pennsylvania Supreme Court's Concurring and Dissenting opinion in *Friends of Danny DeVito*. Yet, Plaintiffs rely on these non-binding opinions without any recognition at all that both the Concurrence and Dissent voiced concern about the lack of an evidentiary record – not any disagreement with the majority's findings on the substantive claims. The majority opinion analyzes—and then denies—most of the claims that Plaintiffs now raise. Plaintiffs rely instead on unrelated cases and ask this Court to ignore the Pennsylvania Supreme Court's analysis of the very Orders at issue. This request should be rejected.

a. <u>Governor Wolf's Orders were a proper exercise of his police powers.</u>

Plaintiffs argue the Governor's actions in shutting down non-life-sustaining businesses were not a lawful exercise of the Governor's police powers. The Pennsylvania Supreme Court first addressed state law issues that are not properly before this Court. The Pennsylvania Supreme Court next determined that the Governor's actions were a proper exercise of his police powers.

The authority of the states when exercising their police powers is broad and, indeed, "one of the least limitable of the powers of government." *District of Columbia v. Brooke*, 214 U.S. 138, 149 (1909). The protection of the public health, safety, and welfare falls within the traditional scope of a State's police powers. *Hillsborough Cty. v. Automated Med. Laboratories, Inc.*, 471 U.S 707, 719 (1985).

The Pennsylvania Supreme Court determined that state law grants the Governor "broad emergency management powers" when responding to a "disaster," including the power to temporarily close certain businesses. *Doc. 1-2* at 18, 27. Plaintiffs' request that this Court overrule Pennsylvania's highest court's interpretation of the state's own laws is wholly improper. As the Pennsylvania Supreme Court addressed and resolved those issues on the basis of state law, this Court is bound by that resolution. *See Washington State Department of Licensing v. Cougar Den, Inc.*, 139 S.Ct. 1000, 1010 (2019) (citing *Johnson v. United States*, 559 U.S. 133, 138 (2010)).

Regarding the Commonwealth's inherent police power under the Tenth Amendment,[5] the United States Supreme Court enunciated the framework by which individual constitutional rights are balanced with a state's need to prevent the spread of disease more than a century ago in *Jacobson v. Massachusetts*, 197 U.S. 11 (1905). At issue in *Jacobson* was the constitutionality of a Massachusetts law requiring all citizens to be vaccinated for smallpox, which was enacted after an outbreak. *Jacobson*, 197 U.S. at 12. Much like Plaintiffs in the present case, the defendant in *Jacobson* argued that "his liberty [was] invaded" by the mandatory vaccination law, which he believed was "unreasonable, arbitrary, and oppressive." *Id.* at 26.

In response, the High Court emphasized that "the liberty secured by the Constitution . . . does not import an absolute right in each person to be, at all times and in all circumstances, wholly freed from restraint." *Id.* Under such an absolutist position, liberty itself would be extinguished:

> There are manifold restraints to which every person is necessarily subject for the common good. On any other basis organized society could not exist with safety to its members. . . . Real liberty for all could not exist under the operation of a principle which recognizes the right of each individual person to use his own, whether in respect of his person or his property, regardless of the injury that may be

---

[5]    The Tenth Amendment provides that "[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the states respectively, or to the people." U.S. Const. Amend. X.

done to others.

*Jacobson*, 197 U.S. at 26. Legal commentators have recognized the Court's central point: "[u]nbridled individual liberty eventually clashes with the liberty interests of others, and without some legal constraints, '[r]eal liberty for all could not exist.'" Thomas Wm. Mayo, Wendi Campbell Rogaliner, and Elicia Grilley Green, "'To Shield Thee From Diseases of the World': The Past, Present, and Possible Future of Immunization Policy," 13 J. Health & Life Sci. L. 3, 9 (Feb. 2020) (quoting *Jacobson*, 197 U.S. at 26).

In striking the proper balance, police powers can be used whenever reasonably required for the safety of the public under the circumstances. *Jacobson*, 197 U.S. at 28; *see also Lawton v. Steele*, 152 U.S. 133, 137 (1894) (a state may exercise its police power when (1) the interests of the public require government interference, and (2) the means used are reasonably necessary to accomplish that purpose). Plaintiffs argue that the Governor has not satisfied the two-prong test established in *Lawton*. They are wrong.

With respect to the first prong—that the interests of the public require government interference—the Pennsylvania Supreme Court correctly determined that the health interests of the public justified the Governor's actions given the unprecedented nature of the COVID-19 pandemic. *Doc. 1-2* at 28-29. Plaintiffs seem to acknowledge that at least some government intervention was warranted; they

merely proffer a series of public policy prescriptions that differ from the actions taken by the Governor. *Doc. 4*, 15-16.

As to the second prong, the closure of non-life-sustaining businesses was a reasonably necessary means of protecting the public health against the spread of COVID-19. Plaintiffs instead propose that their physical locations should have remained open while employing unspecified COVID-19 precautions. *Doc. 4*, 16. But even assuming Plaintiffs' proposals could be discerned and were reasonable, so was the Governor's response. And it has often been said that "debatable questions as to reasonableness are not for the court." *Goldblatt v. Town of Hempstead, N.Y.*, 369 U.S. 590, 594-95 (1962).

As the Pennsylvania Supreme Court found, the Governor "utilized a recognized tool, business closures, to enforce social distancing to mitigate and suppress the continued spread of COVID-19." *Doc. 1-2* at 30. Indeed, nearly every state responded in the same way, ordering all or certain non-essential businesses to close physical locations in order to enforce social distancing.[6] *See Jacobson,* 197 U.S. at 31 (looking to other states and countries in determining that vaccination law was a reasonably necessary means of protecting public health and safety). So have the courts, and for the same reason. *See e.g.*, U.S. Supreme Court closing its building

---

[6]     "State Data and Policy Actions to Address Coronavirus," Kaiser Family Foundation,     https://www.kff.org/health-costs/issue-brief/state-data-and-policy-actions-to-address-coronavirus/ (last visited 5/1/20).

to the public until further notice, https://www.supremecourt.gov/announcements/COVID-19.aspx; U.S. Supreme Court Press Release detailing how the Court will hear May arguments telephonically, https://www.supremecourt.gov/publicinfo/press/pressreleases/pr_04-13-20; and Middle District of Pennsylvania Standing Orders 20-001, 20-001a, 20-003, 20-004, 20-006, 20-008, 20-010.

For these reasons, Plaintiffs cannot show that the Governor's Orders were an unreasonable exercise of his police powers, much less that their rights have been violated.

b. <u>Plaintiffs' procedural due process rights were not violated because – as the Pennsylvania Supreme Court has already held – the present emergency required the state to act quickly.</u>

A procedural due process claim encompasses two inquiries: whether a life, liberty, or property interest entitled to due process protection is at stake; and, if so, what procedures constitute "due process of law" in the situation at hand. Plaintiffs' claimed interest in pursuing their respective business activities unimpeded is not absolute. *Cf. Jacobson*, 197 U.S. at 26 ("persons and property are subjected to all kinds of restraints and burdens in order to secure the general comfort, health, and prosperity of the state"). The Pennsylvania Supreme Court accepted the proposition that "procedural due process is required even in times of emergency[.]" *Doc. 1-2* at

42. But that court went on to correctly conclude that the plaintiffs in *Friends of Danny DeVito* who availed themselves of the waiver process for the Closure order received all of the process due.[7]

Due process "is not a technical conception with a fixed content unrelated to time, place and circumstances." *Gilbert v. Homar,* 520 U.S. 924, 930 (1997). To the contrary, "due process is flexible and calls for such procedural protections as the particular situation demands. . . . [N]ot all situations calling for procedural safeguards call for the same kind of procedure." *Morrissey v. Brewer,* 408 U.S. 471, 481 (1972). "[W]here a State must act quickly, or where it would be impractical to provide predeprivation process, postdeprivation process satisfies the requirements of the Due Process Clause." *Gilbert*, 520 U.S. at 930.

As the Pennsylvania Supreme Court rightly identified, *see Doc. 1-2* at 40-41, "the specific dictates of due process generally requires consideration of three distinct factors[.]" *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976). They are "the private

---

[7]    It is worth pointing out that, except for Plaintiffs Williams and Cassel, none of the other Plaintiffs even claim to have availed themselves of the waiver process established by the Governor, and therefore lack standing to challenge the adequacy of the procedure. *See Alvin v. Suzuki*, 227 F.3d 107, 116-19 (3d Cir. 2000) (holding that appellant could not state a procedural due process claim where he failed to avail himself of an available grievance procedure and that alleged futility did not excuse his failure to do so). Plaintiffs Williams and Cassel aver they, along with 35,000 others, were included in a waiver request submitted by the Pennsylvania Association of Realtors. *Doc. 1, ¶¶*77-78. Defendants do not concede that a group submission is sufficient to confer standing, but will reserve that argument for future briefing.

13

interest that will be affected by the official action; . . . the risk of an erroneous deprivation of such interest through the procedures used [including] the probable value, if any, of additional or substitute procedural safeguards; and . . . the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement[s] would entail." *Id.*

The notion that an individual or business was "entitled to the full panoply of procedural due process rights to challenge the [Business Closure] Order (containing the list placing them in the non-life-sustaining category) prior to its entry[,]" was correctly rejected by the Pennsylvania Supreme Court. *Doc. 1-2* at 40-41. With the rapid spread of COVID-19, there was an "urgent need to act quickly to protect the citizens of the Commonwealth from sickness and death[.]" *Id.* Plaintiffs—"and every other business in the state on the non-life-sustaining list"—could not possibly be afforded pre-deprivation notice and an opportunity to be heard. *Id.* at 41. That would have delayed the entry of the Governor's Order "by weeks, months, or even years, an entirely untenable result[.]" *Id.* Even more untenable is Plaintiffs' proposal that every Pennsylvania citizen should have been afforded pre-deprivation notice and an opportunity to be heard with respect to the Stay at Home Order which would have caused even greater delays in implementation.

On the issue of post-deprivation process, the Pennsylvania Supreme Court, faithful to *Mathews'* balancing approach and other precedents, "conclude[d] that the waiver process provide[d] sufficient due process under the circumstances presented here." *Doc. 1-2* at 42. This was so, according to that court, because "'[p]rotection of the health and safety of the public is a paramount governmental interest which justifies summary administrative action. Indeed, deprivation of property to protect the public health and safety is '[o]ne of the oldest examples' of permissible summary action." *Doc. 1-2* at 43 (quoting *Hodel v. Virginia Surface Min. & Reclamation Ass'n, Inc.*, 452 U.S. 264, 300-01 (1981)).

The Pennsylvania Supreme Court also pointed out that the term "waiver process" is a misnomer, as it was not intended "to provide waivers to businesses that are not life-sustaining, but rather constitute[d] an attempt to identify businesses that may have been mis-categorized as non-life-sustaining." *Doc. 1-2* at 44. That court explained that this is "an entirely proper focus of procedural due process" which, after all, "is geared toward protecting individuals from the *mistaken* deprivation of life, liberty, or property." *Id.* (emphasis in original) (citing *Carey v. Piphus*, 435 U.S. 247, 259-260 (1978)).

Plaintiffs' focus on the alleged unfairness and arbitrariness of the waiver process here is both wrong and beside the point. It is wrong because the Governor's determinations as to which physical locations must close in order to protect lives

was based on well-established and clear NAICS classifications. *Doc. 1-2* at 8-9. It is beside the point because Plaintiffs merely disagree as a matter of public policy with the Governor's classification of them as non-life-sustaining.[8] Doc. 1, ¶¶ 63-65; Doc. 3, ¶¶ 29-30, 35, 43.

As part of its *Mathews* analysis, the Pennsylvania Supreme Court also emphasized that any loss of a business' property rights is temporary.[9] *Doc. 1-2* at 45. Accordingly, the risk that the available waiver process may result in an erroneous deprivation cannot "outweigh the value of additional or substitute safeguards." This follows because more elaborate procedures cannot possibly be "provided within a realistic timeframe." *Id.* To do what Plaintiffs claim is required "would overwhelm an entire department of government otherwise involved in disaster mitigation." *Id.*

---

[8]     Plaintiffs also complain that those administering the waiver process, which even Plaintiffs note has benefitted thousands of Pennsylvanians, have stopped taking new waiver applications. *Doc. 1, ¶19.* This is misguided. By design, the waiver process will no longer be necessary as restrictions on businesses are eased and currently-closed locations are allowed to reopen. A measured reopening phase is already under way as of this writing.  Continuing to accept waiver applications is therefore unnecessary.

[9]     Plaintiffs seize upon Chief Justice Saylor's observation in his Concurrence and Dissent that "[w]hile the majority repeatedly stresses that such closure is temporary . . . this may in fact not be so for businesses that are unable to endure the associated revenue losses." *Doc. 1-2* at 70. Plaintiffs strip this comment from all meaningful context. The Concurrence and Dissent voiced concern about the lack of a record in this instance. *Id.* at 71-72. Nothing in the existing record establishes the specific long-term effects on any business, much less Plaintiffs' businesses.

Finally, the absence of further appeal from a waiver denial does not render the waiver process constitutionally deficient. Federal and state statutes contemplate judicial review of certain governmental determinations under certain circumstances. *See, e.g.,* 5 U.S.C. § 702; 2 Pa.C.S. §§ 702, 704. Conceptually, such review is an element of the "due process" available in those contexts. But Plaintiffs' implicit assumption that *every* decision or order by a government official *must* be judicially reviewable is fanciful. "The very nature of due process negates any concept of inflexible procedures universally applicable to every imaginable situation." *Cafeteria and Restaurant Workers Union, Local 473 v. McElroy*, 367 U.S. 886, 895 (1961). Even criminal defendants, who are obviously entitled to due process when prosecuted, do not have an absolute right, under the Constitution, to appeal. *See, e.g., Jones v. Barnes*, 463 U.S. 745, 751 (1983).

Here, as the Pennsylvania Supreme Court explained, decisions issued by the Governor and Secretary are not administrative adjudications of a state agency that would be appealable to the courts "by law" in accordance with Pa. Const. art. V, § 9. *Doc. 1-2* at 46-47. Moreover, "the summary procedure of a review of an application for a waiver meets the exigency of this disaster—social distancing." *Doc. 1-2* at 45. What Plaintiffs envision would require "in person testimonials, cross-examination and oral argument," which in turn would require "massive numbers of staff . . . (who would be working from home)" and "troves of telecommunication

17

devices . . . to accomplish it." *Id.* at 45-46. "The near impossibility of such procedures contrasted with the temporary deprivation at issue here drives the conclusion that the waiver process . . . provides an adequate opportunity for [Plaintiffs] to make their case for reclassification." *Id*. at 46.

Accordingly, "[u]nder the circumstances of an ongoing disaster emergency, a full evidentiary proceeding is not a viable post-deprivation procedural process." *Id.* None of the authorities Plaintiffs rely on undercut the conclusion of the Pennsylvania Supreme Court on this issue. Plaintiffs' claim fails utterly and, thus, it cannot be said that they are likely to succeed on the merits.

> c.  <u>Plaintiff Nace did not suffer an unjust taking because his business' physical location was temporarily closed pursuant to the Governor's police powers.</u>

Plaintiff Nace alleges that the Business Closure Order "denies [him] of the economically viable use of [his] business premises and the personal property situate[d] there" amounting to a taking under the Fifth Amendment and entitling him to compensation. *Doc. 1,* ¶¶112-113. The Pennsylvania Supreme Court has already rejected this argument.

As explained above, the Governor's actions in regulating the physical location of businesses have been made pursuant to the state's police powers—not through the power of eminent domain. As the Supreme Court stated in *Keystone Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S. 470, 492 n. 22 (1987):

> Courts have consistently held that a State need not provide compensation when it diminishes or destroys the value of property by stopping illegal activity or abating a public nuisance. It is hard to imagine a different rule that would be consistent with the maxim "sic utere tuo ut alienum non laedas" (use your own property in such manner as not to injure that of another).

*Id.* (internal citations omitted).

As the Pennsylvania Supreme Court correctly recognized, the Governor's Closure Order "result[ed] in only a temporary loss of the use of the [Plaintiffs'] business premises" in order to "protect the lives and health of millions of Pennsylvania citizens[.]" *Doc. 1-2* at 36-38 (citing *Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency*, 535 U.S 302 (2002); *Manigault v. Springs*, 199 U.S. 473 (1905)). As the Pennsylvania Supreme Court correctly recognized, the Governor's Closure Order "result[ed] in only a temporary loss of the use of the [Plaintiffs'] business premises" in order to "protect the lives and health of millions of Pennsylvania citizens[.]" *Doc. 1-2* at 36-38 (citing *Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency*, 535 U.S 302 (2002); *Manigault v. Springs*, 199 U.S. 473 (1905)). In reaching that conclusion, the high Court of Pennsylvania relied on the Supreme Court of the United States' decision in *Tahoe-Sierra*. In that case, the Tahoe Regional Planning Agency ("TRPA") imposed two moratoria, totaling thirty-two months, on development in the Lake Tahoe Basin while formulating a comprehensive land-use plan for the area. *Tahoe-Sierra*, 535 U.S. at

335. The Court, in rejecting the landowners' argument that a deprivation of all use equates to a *per se* taking, ruled that there was no taking.

The high Court in *Tahoe-Sierra* declined to adopt an "extreme categorical rule that any deprivation of all economic use, no matter how brief, constitutes a compensable taking." *Id.* The Court noted that such a rule would apply broadly to "normal delays in obtaining building permits, changes in zoning ordinances, variances, and the like… well as to orders temporarily prohibiting access to crime scenes, businesses that violate health codes, fire-damaged buildings, or other areas that we cannot now foresee." *Id.* Such a rule would undoubtedly require changes in numerous practices that have long been considered permissible exercises of the police power. *Id.*

The United States Court of Appeals for the Third Circuit relied upon *Tahoe-Sierra* in a case involving an emergency situation bearing similarities to the present disaster crisis. In *Nat'l Amusements Inc. v. Borough of Palmyra*, 716 F.3d 57 (3d Cir. 2013), the Borough of Palmyra ordered closed for five months an open-air flea market, owned and operated by National Amusements, Inc. ("NAI"), due to safety concerns posed by unexploded munitions left behind when the site had been used as a weapons-testing facility for the United States Army. Relying on the holding in *Tahoe-Sierra*, the court of appeals categorically denied that a regulatory taking had occurred.

In sum, "[s]tates are accorded wide latitude in the regulation of their local economies under their police powers, and rational distinctions may be made with substantially less than mathematical exactitude." *City of New Orleans v. Dukes,* 427 U.S. 297, 303 (1976). The temporary closure of Plaintiff Nace's physical business location is not a Fifth Amendment taking and no compensation is due. Plaintiff Nace therefore is not likely to succeed on the merits.

        d. The Governor's Orders do not infringe on Plaintiffs' First Amendment Rights because the Orders are content-neutral and issued in furtherance of a substantial governmental interest.

Plaintiffs allege that the Governors' Orders restrict their freedoms of speech and assembly. Both the Pennsylvania Supreme Court and Plaintiffs' counsel's own experience have demonstrated this is not true.

While the First Amendment generally prohibits states from "abridging the freedom of speech, or of the press[,]" U.S. Const. amend. I, States may place "content neutral" time, place, and manner regulations on speech "so long as they are designed to serve a substantial governmental interest and do not unreasonably limit alternative avenues of communication." *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 46-47 (1986). "The principal inquiry in determining content neutrality . . . is whether the government has adopted a regulation of speech because of disagreement with the message it conveys." *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989). And "when a content-neutral regulation does not entirely foreclose

21

any means of communication, it may satisfy the tailoring requirement even though it is not the least restrictive or least intrusive means of serving the statutory goal." *Hill v. Colorado*, 530 U.S. 703, 726 (2000).

As the Pennsylvania Supreme Court correctly determined, "[t]here is no question that the containment and suppression of COVID-19 and the sickness and death it causes is a substantial governmental interest," and that the Governor's Order is content neutral because "[i]t does not regulate speech at all, let alone based on content." *Doc. 1-2* at 50-51. The Pennsylvania Supreme Court recognized that alternative avenues to communicate and assemble continue to both exist and flourish. They exist online, which in the modern age has become a quintessential forum for the exercise of First Amendment rights. *See Doc. 1-2* at 51 (citing *Packingham v. North Carolina*, 137 S. Ct. 1730, 1735 (2017)).[10] They also exist through means that allow for social distancing: the Governor's Orders do not limit political candidates and their supporters from speaking on television and radio; the Orders do not prevent any campaign from sending out direct mailings; the Orders do

---

[10]     Vote Bill Benner has a website (https://votebillbenner.com) and is active on Facebook, (https://www.facebook.com/votebillbenner).    Similarly, Plaintiff's counsel has a Twitter site (https://www.twitter.com/PAVsWolf1) and GoFundMe page (https://www.gofundme.com/f/scaringi-law-v-governor-tom-wolf) dedicated to discussing the Governors' Orders and the lawsuits he has filed related thereto.

not prohibit putting up yard signs; and, the Orders do not stop anyone from speaking to the press.

Plaintiffs misconstrue the scope of the Governors' Orders and the nature of their enforcement. Specifically, Plaintiffs assert that the Governor's Orders prohibit them from exercising their right to free speech and assembly at their places of business and at the location of any other business on the non-life-sustaining list. *Doc. 1, ¶*138. The Governor's Orders do no such thing. They permit protests in outdoor spaces so long as protestors maintain social distancing. And even when social distancing is not strictly adhered to, individuals are not being stopped or cited for protesting. For example, on both April 20, 2020 and May 15, 2020, "[l]awyer and radio host Marc Scaringi," Plaintiffs' counsel, spoke to rallies in front of the state Capitol building protesting the Governor's Orders. Steven Marroni, et al., "Protest of Gov. Wolf's coronavirus shutdown at Capitol: Recap," PennLive.com, https://www.pennlive.com/news/8d1601-protest-of-gov-wolf-s-coronavirus-shutdown-at-capitol-live-updates.html (last visited 5/15/20) (reporting on the April 20, 2020 rally).   https://www.pennlive.com/news/2020/05/police-in-harrisburg-prepare-for-another-anti-shutdown-protest-friday-at-the-capitol.html (last visited 5/15/20) (reporting on the rally planned for May 15, 2020).  The protestors were not cited or stopped. Plaintiffs' argument is belied by their counsel's own personal experience.

23

The Governor's Order is precisely the type of content-neutral, narrowly tailored protection of the health and safety of citizens that a State is permitted to enforce. *See Hill*, 530 U.S. at 715; *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288 (1984) (upholding prohibition against sleeping in public park). Plaintiffs' claim is without merit, and thus fails to establish likelihood of success on the merits.

> e. <u>Plaintiffs cannot establish an Equal Protection violation because they are not similarly situated to any owners of life-sustaining business.</u>

Plaintiffs allege that "Defendants' classification of Pennsylvania businesses and entities into life-sustaining and non-life-sustaining is arbitrary and lacks rationality. . . [violating] the equal protection clause." *Doc. 1, ¶31.* The United States Constitution does not require state officials to treat all entities "alike where differentiation is necessary to avoid an imminent threat" to health and safety. *Jones v. N. Carolina Prisoners' Labor Union, Inc.*, 433 U.S. 119, 136 (1977); *Williamson v. Lee Optical of Oklahoma, Inc.*, 348 U.S. 483, 489 (1955) ("Evils in the same field may be of different dimensions and proportions, requiring different remedies.")

Here, Vote Bill Benner argues that it is similarly situated to unidentified Social Advocacy Organizations because the campaign also advocates for vulnerable individuals. *Doc. 1, ¶¶126-128.* Accordingly, it believes the physical campaign office should be permitted to open. *Doc. 1, ¶¶124-125.* But Vote Bill Benner is not

similarly situated to Social Advocacy Organizations and no equal protection violation exists.

In describing Social Advocacy Organizations, the NAICS Code states "[e]stablishments in this industry address issues, such as peace and international understanding; community action (excluding civic organizations); or advancing social causes, such as firearms safety, drunk driving prevention, or drug abuse awareness."[11] These organizations exist for the exclusive purpose of advancing social causes. In contrast, Vote Bill Benner is a political campaign whose exclusive mission is to get Mr. Benner elected. Indeed, the Pennsylvania Supreme Court noted that another political campaign, the DeVito Committee, was "not similarly situated to social advocacy groups[,]" because, unlike the latter, the committee does not "advocate for vulnerable individuals during this time of disaster." The court stated "[w]hile Mr. DeVito personally may similarly advocate for worthy social and political causes, there is no indication that DeVito Committee does so nor is it the primary focus of the operation." *Doc. 1-2* at 48. The same is true here and this Court should likewise find there is no equal protection violation.

Plaintiffs' argument is nothing more than a public policy disagreement with the Governor's determination as to which physical locations would remain open and which would be temporarily closed. Plaintiffs essentially argue that if they had been

---

[11]    https://www.naics.com/naics-code-description/?code=813319

empowered by law to make these life and death decisions, they would have responded to this global crisis differently. But it is not Plaintiffs' decision.

Nor is this difficult public policy determination for the courts. The Pennsylvania Supreme Court correctly recognized, "[i]t is not for this Court, but rather for the Governor pursuant to the powers conferred upon him by the Emergency Code, to make determinations as to what businesses, or types of businesses, are properly placed in either category." *Doc. 1-2* at 51. Likewise, "the Fourteenth Amendment gives the federal courts no power to impose upon the States their views of what constitutes wise economic or social policy. . . . [I]n the local economic sphere, it is only the invidious discrimination, the wholly arbitrary act, which cannot stand consistently with the Fourteenth Amendment." *City of Dallas v. Stanglin*, 490 U.S. 19, 27 (1989) (internal quotation marks and citations omitted). *See also*, *Whitmore v. Arkansas*, 495 U.S. 149, 161 (1990) ("It is not for this Court to employ untethered notions of what might be good public policy to expand our jurisdiction in an appealing case").

Here, during an unprecedented and rapidly evolving global health disaster, deference to the public policy decisions of the Commonwealth is most appropriate. The Governor's Order balances the economic interests of the Commonwealth against the health and lives of 12.8 million Pennsylvanians. Temporarily closing certain physical locations in order to protect lives is certainly not invidious or wholly

arbitrary. The health and survival of those citizens is the most compelling of state interests. And the classifications and distinctions made to protect our citizenry are absolutely essential—not just reasonably related—to achieving that most compelling of state interests. Because the Governor's Order does not violate the Equal Protection Clause, Plaintiffs have not shown a likelihood of success on the merits.

**2. Plaintiffs Cannot Establish A Likelihood Of Success On The Merits For Their Novel Legal Theories, Which Have No Bases In Law.**

Plaintiffs have raised several novel claims not litigated in *Friends of Danny DeVito. See Doc. 1-2.* They cannot demonstrate a likelihood of success on these claims either.

a. Plaintiffs have not presented a viable substantive due process claim.

Count II of Plaintiffs' complaint purports to raise a substantive due process claim. Plaintiffs, however, evidence no understanding of the elements of such a claim. Indeed, "[a]s a general matter, the [Supreme] Court has always been reluctant to expand the concept of substantive due process because guideposts for responsible decision making in this uncharted area are scarce and open-ended." *Collins v. City of Harker Heights, Tex.*, 503 U.S. 115, 125 (1992). *Accord Washington v. Glucksberg*, 521 U.S. 702, 720 (1997).

27

"Substantive due process refers to and protects *federal* rights." *Ransom v. Marazzo*, 848 F.2d 398, 411 (3d Cir. 1988) (emphasis added). That being so, the analysis of any substantive due process claim "must begin with a careful description of the asserted right[.]" *Reno v. Flores*, 507 U.S. 292, 302 (1993). To be protected, the "asserted right" must be "fundamental" – arising from the Constitution itself, not from state law. *Id. See also, e.g., Desi's Pizza, Inc. v. City of Wilkes-Barre,* 321 F.3d 411, 427 (3d Cir. 2003); *Nicholas Pennsylvania State University*, 227 F.3d 133, 140-142 (3d Cir. 2000).

Plaintiffs' papers are replete with references to a host of claimed affronts to their "rights" but, as discussed above, the Governor's Orders are consistent with those rights. Moreover, "[w]here a particular Amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of 'substantive due process,' must be the guide for analyzing these claims." *Bruni v. City of Pittsburgh*, 824 F.3d 353, 374-75 (3d Cir. 2016) (quoting *Albright v. Oliver*, 510 U.S. 266, 273 (1994)). Plaintiffs' invocation of multiple particular constitutional amendments are antithetical to a substantive due process claim.

At bottom, the actual basis for this action is clear: Plaintiffs challenge the Governor's Orders because their right to operate their businesses as usual has been curtailed. As they see it, they have an absolute right to engage in economic activity

as they see fit. That is not the law. Nor does such a claim provide viable support for a violation of substantive due process.

What Plaintiffs are complaining about appears to concern the impairment of their *property* interests. *See* U.S. Const. amend. XIV, § 1 ("nor shall any State deprive any person of . . . property, without due process of law"). And "[p]roperty interests, of course, are not created by the Constitution. Rather they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law." *Board of Regents of State Colleges v. Roth*, 408 U.S. 564, 577 (1972). By today's constitutional standards, then, the alleged impairment of individuals' state-law property interests, by state actors, cannot serve as the basis for a substantive due process claim.[12]

Even assuming, *arguendo*, that Plaintiffs' averments could be forced into a substantive-due-process framework, any such claim would still fail as a matter of law. When applicable, substantive due process principles limit what the government can do in both its legislative and executive capacities. *County of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998). The Governor's Orders have attributes of both executive action (in that the Governor is the Chief Executive of the Commonwealth)

---

[12]   It might have been different a hundred years ago, or so, when the Due Process Clause was invoked to strike down "unreasonable" economic legislation as "unwise," but that line of authority long since been repudiated. *See Ferguson v. Skrupa*, 372 U.S. 726, 729-730 (1963) (summarizing change in legal doctrine).

and legislation (in that the statutorily-authorized order at issue is a legally binding official pronouncement). Somewhat different analytical standards apply when legislation is challenged, compared to when executive action is challenged, but whichever way the Orders are viewed, there is no substantive due process rationale for invalidating them.

A legislative enactment—analogous to the Governor's Orders—will not infringe upon anyone's substantive due process rights as long as there is a rational basis for the enactment. *See, e.g., Heffner v. Murphy,* 745 F.3d 56, 79 (3d Cir. 2014).[13] "Under rational basis review, a statute withstands a substantive due process challenge if the State identifies a legitimate state interest that the legislature could rationally conclude was served by the statute." *Id.* (citation and internal quotation marks omitted). Under this deferential standard, there need not be "mathematical precision in the fit between justification and means." *Id.* at 80. "Policy decision[s] about where lines should be drawn . . . [are] not legally relevant under substantive due process jurisprudence." *Id.* at 83.

Put simply, courts do not second-guess the wisdom of policy choices. Though couched as legal challenges, much of plaintiffs' complaint amounts to a series of

---

[13]   There are limited exceptions for laws relating to marriage, procreation, contraception, family relationships, and child-rearing, which are subject to more searching substantive due process review. *See Lawrence v. Texas*, 539 U.S. 558, 573-574 (2003).

policy critiques of the Governor's actions. Governor Wolf's actions constitute a rational response to the public health emergency. This is so no matter how vehemently plaintiffs disagree with the policy choices that underlie them.

A substantive due process claim based on allegedly questionable executive action is even less availing. "[E]xecutive action violates substantive due process only when it shocks the conscience[.]" *United Artists Theatre Circuit, Inc. v. Township of Warrington, Pa.*, 316 F.3d 392, 399-400 (3d Cir. 2003).  Decisions or actions do not rise to this level even if they are arbitrary and capricious. *See Hunterson v. DiSabato*, 308 F.3d 236, 248 (3d Cir. 2002). Rather, "only the most egregious official conduct" meets the demanding shock-the-conscience standard.  *Lewis*, 523 U.S. at 846. To shock the conscience, official action must be egregiously wrong, abusive, oppressive, "intended to injure in some way unjustifiable by any government interest." *Id.*, 523 U.S. at 849.

Notwithstanding the possible impact of the Governor's Orders on Plaintiffs' individual business interests, issuance of the Orders cannot be deemed conscience-shocking. To the contrary, given the enormous public health challenges confronting virtually every citizen of the Commonwealth, it would have been conscience-shocking if the Governor had *not* taken decisive action to contain COVID-19.

> b. <u>Plaintiffs are not entitled to payment for the use of their property under Pennsylvania law because it has not been taken for public use</u>

31

Plaintiffs argue they are entitled to payment for the use of their property under 35 Pa. C.S. §7313 (10). They are incorrect. This statute grants the Pennsylvania Emergency Management Agency the power "to plan and make arrangements for the availability and use of any private facilities, services and property and, if necessary **and if in fact used, provide for payment for use** under terms and conditions agreed upon." 35 Pa.C.S.A. §7313(10) (*emphasis added).* The statute only requires payment when private property is taken and used for public emergency purposes or when the Governor commandeers property pursuant to 35 Pa. C.S. § 7301(f)(4). This has not happened here. The Governor's Order has only temporarily shuttered the physical locations of Plaintiffs' businesses, it has not taken them for public use; therefore, no compensation is due and Plaintiffs cannot succeed on the merits of Count IV.

> c. <u>Plaintiffs' Guarantee Clause claim fails because such claims are solely committed to the judgment of Congress.</u>

Plaintiffs' raise an obscure claim alleging that their rights guaranteed in the Guarantee Clause of Article IV, § 4 of United States Constitution have been violated. It is well established that this type of "form of governance" claim is not actionable.

The Supreme Court of the United States has "several times concluded [] that the Guarantee Clause does not provide the basis for a justiciable claim." *Rucho v. Common Cause*, 139 S. Ct. 2484, 2506 (2019) (citing *Pacific States Telephone & Telegraph Co. v. Oregon*, 223 U.S. 118 (1912)); *see also Risser v. Thompson*, 930

F.2d 549, 552 (7th Cir. 1991) (noting that the rule that a claim under the Guarantee Clause is not justiciable "is too well entrenched to be overturned at our level of the judiciary."). The claims are "not cognizable by the judicial power, but solely committed by the Constitution to the judgment of Congress." *Pac. States Tel. & Tel. Co.*, 223 U.S. 118.

Here, Count VII of Plaintiffs' Complaint, which is expressly grounded in the Guarantee Clause, fails under well-established and binding Supreme Court caselaw. Therefore, Plaintiffs cannot establish a likelihood of success on the merits of this claim, and it cannot support a TRO.

      d.   <u>The Governor's Order temporarily closing all schools does not violate freedom of religion because it does not prevent free exercise and is a neutral law of general applicability.</u>

Plaintiff Williams argues that the Governor's March 13, 2020 Order closing all schools within the Commonwealth violates his children's rights to attend mass, sing in the choir, and daily pray at St. Maximilian Kolbe School in the Archdiocese of Philadelphia, and therefore, the First Amendment. *Doc. 1*, ¶¶45-46. This claim is both procedurally flawed and substantively groundless.

First, the Governor's Order to temporarily close all schools does not prevent Williams' children from practicing their religion. Attending masses, participating in

choir, and praying were not prohibited by any Commonwealth order.[14] The decision to stop public gatherings in Catholic churches within the Archdiocese of Philadelphia was made by the Archbishop himself in order to "to ensure the health and welfare of those entrusted to the pastoral and temporal care of our Church."[15] On March 18, 2020, Archbishop Nelson Pérez suspended the public celebration of "all Masses in the Archdiocese of Philadelphia for the time being."[16] Churches within the Archdioceses remain open, however, for private prayer and confessions.[17]

Second, the Governor's Order to temporarily close all schools was a neutral law of general applicability that does not offend the First Amendment. Williams' claim essentially argues that the Commonwealth cannot regulate a school operated by a church. This astonishing proposition finds no support in the law. Indeed, the law is directly to the contrary.

---

[14]   Churches are considered life-sustaining organizations, and thus exempt from the closure and stay-at-home orders.

[15]   "Archbishop Nelson J. Pérez Announces The Suspension Of All Public Masses In The Archdiocese Of Philadelphia Effective At Noon Tomorrow," Archdiocese of Philadelphia, http://archphila.org/archbishop-nelson-j-perez-announces-the-suspension-of-all-public-masses-in-the-archdiocese-of-philadelphia-effective-at-noon-tomorrow/ (3/17/20).

[16]   *Id.*

[17]   *Id.*; "St. Max During the Coronavirus," St. Maximilian Kolbe website, https://stmax.org/coronavirus-parish-updates (3/19/20).

The U.S. Supreme Court has long acknowledged the "power of the State reasonably to regulate all schools, to inspect, supervise and examine them . . . ." *Pierce v. Soc'y of Sisters of the Holy Names of Jesus and Mary*, 268 U.S. 510, 534 (1925). "[W]hile parents have a constitutional right to send their children to private schools, . . . they have no constitutional right to provide their children with private school education unfettered by reasonable government regulation." *Runyon v. McCrary*, 427 U.S. 160, 178 (1976). Thus, when—as here—a regulation of a school "neither targets religious practice nor selectively imposes burdens on religiously motivated conduct," it is examined under rational basis review. *Combs v. Homer-Center School District*, 540 F.3d 231, 242-43 (3d Cir. 2008) (upholding regulation of home-schooling against free exercise challenge). "'[R]ational basis review requires merely that the action be rationally related to a legitimate governmental objective.'" *Id.* (quoting *Tenafly Eruv Ass'n, Inc. v. Tenafly*, 309 F.3d 144, 165 n.24 (3d Cir. 2002)).

The closure of schools to arrest a pandemic is rationally related to a substantial—let alone legitimate—governmental objective. As the Pennsylvania Supreme Court already recognized, "[t]here is no question that the containment and suppression of COVID-19 and the sickness and death it causes is a substantial governmental interest." *Doc. 1-2* at 50. The Commonwealth temporarily closed all public and private schools because, even if children are less likely to die from this

35

disease, they still may become seriously sick and/or carry the disease home to their parents and grandparents. For this same reason, 48 states and the District of Columbia closed their schools for the remainder of the school year.[18]

Finally, Williams' request for injunction would not result in the relief he seeks. On April 9, 2020, the Secretary of Education, Pedro Rivera, independently ordered the closure of all schools within Pennsylvania for the 2019-2020 school year.[19] Secretary Rivera issued this order under authority specifically granted to him by the General Assembly to respond to the COVID-19 pandemic. *See* 24 P.S. § 15-1501.8 ("The Secretary of Education may . . . Order the closure of all school entities until the threat to health and safety caused by the pandemic of 2020 has ended"). Williams neither sues Secretary Rivera nor challenges the legality of this Order. As such, even if this Court were to grant the relief sought, the schools would remain closed.

        e.  <u>Plaintiffs' right to public education claim has no merit because children continue to be educated through virtual classrooms.</u>

---

[18]     Nicole Chavez, et al., "48 states have ordered or recommended that schools don't reopen this academic year," CNN, https://www.cnn.com/2020/04/18/us/schools-closed-coronavirus/index.html (5/7/20).

[19]     April 9, 2020 Order, https://www.education.pa.gov/Documents/K-12/Safe%20Schools/COVID/Act%2013%20Order.pdf (last visited 5/12/20).

Under the Pennsylvania Constitution, "[t]he General Assembly shall provide for the maintenance and support of a thorough and efficient system of public education to serve the needs of the Commonwealth." Pa. Const. art. 3, §14.[20] [21] The Governor's Orders do not abridge this constitutional mandate.

Even if they Governor's school closure Order was somehow improper – which it was not – then, any infringement caused by the Order was abated when the Pennsylvania General Assembly passed, and the Governor signed, Act 13 of 2020, which authorized the Secretary of Education to order the closure of all school entities until the threat to health and safety caused by the Pandemic of 2020 has ended.

Plaintiffs' children are not being deprived of an education. The Governor merely ordered physical locations of schools to be closed. Education continues to be provided to children across Pennsylvania through virtual classrooms. Plaintiffs do not dispute that children are being educated. Rather, they disagree with the manner and quality of the educational programming which is being administered. This is not a constitutional violation. This is a challenge to a policy consideration, which is not

---

[20]    The Pennsylvania Constitution does not provide a cause of action for monetary damages. *See Jones v. City of Phila.,* 890 A.2d 1188, 1215–16 (Pa. Cmwlth. 2006). Thus, if Plaintiffs were found to be entitled to any relief at all – which they are not – injunctive relief would be all that remains.

[21]    To the extent Plaintiffs premise their Right to Public Education Claim on 42 U.S.C. §1983, this is an improper invocation of that statute. Section 1983 only provides private citizens a cause of action for violations of ***federal*** law by state officials – not a violation of a state constitutional clause. *See* 42 U.S.C. § 1983.

37

within the purview of this Court. Therefore, Plaintiffs cannot prevail on the merits of this claim.

**B.** **PLAINTIFFS CANNOT DEMONSTRATE THEY ARE LIKELY TO SUFFER IRREPABLE HARM IF RELIEF IS NOT GRANTED**

"Establishing a risk of irreparable harm is not enough." *ECRI v. McGraw-Hill, Inc.*, 809 F.2d 223, 226 (3d Cir. 1987). A plaintiff has the burden of proving a "clear showing of immediate irreparable injury." *Continental Group, Inc. v. Amoco Chemicals Corp.,* 614 F.2d 351, 359 (3d Cir.1980). The "requisite feared injury or harm must be irreparable—not merely serious or substantial," and it "must be of a peculiar nature, so that compensation in money cannot atone for it." *Glasco v. Hills,* 558 F.2d 179, 181 (3d Cir. 1977). "[W]e have never upheld an injunction where the claimed injury constituted a loss of money, a loss capable of recoupment in a proper action at law." *ECRI*, 809 F.2d at 226. The "burden of showing irreparable injury 'is not an easy burden' to meet." *Moore v. Mann*, No. 3:CV-13-2771, 2014 WL 3893903, at *2 (M.D. Pa. Aug. 7, 2014).

While the loss of First Amendment rights can constitute irreparable injury in certain circumstances, "the assertion of First Amendment rights does not automatically require a finding of irreparable injury, thus entitling a plaintiff to a preliminary injunction if he shows a likelihood of success on the merits." *Hohe v. Casey*, 868 F.2d 69, 73 (3d. Cir. 1989). "Rather the plaintiff[s] must show "a chilling

effect on free expression." *Id.* at 73 (*citing Dombrowski v. Pfister*, 380 U.S. 479, 487 (1965)).

Contrary to Plaintiffs' assertions, they have not been deprived of any freedom guaranteed by the First Amendment. Plaintiffs are still free to speak, assemble, and exercise their religion subject to reasonable time and manner restrictions. Nothing in the School Closure Order prevents Plaintiff Williams from practicing his religion or continuing the religious education of his children.[22] Accordingly, he cannot demonstrate irreparable harm.

The remaining Plaintiffs allege they will suffer irreparable harm because they will experience substantial business losses. *Doc. 4* at 22. For an injunction to be warranted, the claimed "irreparable harm" cannot be based solely on speculation and hypothesis. *See ECRI* 809 F.2d at 226. Such is the case here.

Plaintiffs have not made a showing of irreparable harm based upon a disruption in their business operations and loss of money. Plaintiffs are suffering the same disruption faced by all other non-life-sustaining businesses in the Commonwealth. This disruption is not actionable. Indeed, there is no precedent

---

[22]   According to their school's website, students have been continuing their education online since March 16, 2020. Students were already accustomed to remote programing, such as Google Classroom, and "scheduled Zoom classroom instruction and meetings allow the students to see one another and ask questions about their lessons." St. Maximilian Kolbe School, https://school.stmax.org/ (last visited 5/16/20).

indicating that economic harm can constitute irreparable harm in the face of a Declaration of Disaster.

Economic harm is generally insufficient in constituting irreparable harm for purposes of a preliminary injunction, particularly where that economic harm is speculative. Here, Plaintiffs have presented no data, studies, testimony or other evidence showing what their economic harm will be during these unprecedented times. Further, any financial loss they claim is not of a type as to require emergency, extraordinary relief from this Court. Plaintiffs' businesses have now been closed for 59 days. Any emergent need to enjoin the Governors' Orders is belied by Plaintiffs' delay in bringing this action.

The Commonwealth is in the process of reopening.[23] Indeed, 37 counties have already entered the "yellow" phase with 12 more—including Perry County where Plaintiffs' Benner and Nace are based—set to enter the "yellow" phase on May 22, 2020.[24] Even if this Court were to enjoin the Governor's Orders and allow Plaintiffs to reopen their physical business locations, there is no guarantee this will abate their losses. Plaintiffs' myopic view assumes they will experience an immediate

---

[23]    https://www.governor.pa.gov/newsroom/gov-wolf-announces-reopening-of-24-counties-beginning-may-8/

[24]    https://www.governor.pa.gov/newsroom/gov-wolf-12-more-counties-to-move-to-yellow-phase-on-may-22/

resurgence of their businesses upon opening their doors. They ignore the fact that the pandemic will still exist and many citizens may not be comfortable venturing into these physical locations. Additionally, social distancing guidelines and other safety precautions will still need to be followed which may limit business.

Moreover, because Plaintiffs have no clear right to relief on the merits, there is no *per se* irreparable harm. Plaintiffs attempt to circumvent their obligation to adduce concrete evidence of irreparable harm by falling back on their arguments on the merits. In sum, Plaintiffs have not demonstrated any actual harm that surpasses the importance of the Declaration of Disaster, warranting continuing operation of in-person transactions at their businesses.

### C.   THE BALANCE OF THE HARMS AND THE PUBLIC INTEREST WEIGH AGAINST A TEMPORARY RESTRAINING ORDER

Even if Plaintiffs satisfy the first two elements of the analysis – and they do not – the Court must consider whether an injunction "would harm the [defendants] more than denying relief would harm the [plaintiffs]" and "whether granting relief would serve the public interest." *Ass'n of New Jersey Rifle & Pistol Clubs, Inc.*, 910 F.3d at 115. In each case, courts "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Amoco Production Co.*, 480 U.S., at 542, 107 S.Ct. 1396. "In exercising their sound discretion, courts of equity should pay particular regard for the public

consequences in employing the extraordinary remedy of injunction." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). Instantly, the equities weigh in favor of denying Plaintiffs' request for a temporary restraining order.

Plaintiffs maintain that the citizens of Pennsylvania and the Governor will not be harmed by a restraining order because "the Governor has barely been enforcing these orders in the first place" and "the curve has been flattened, Pennsylvania hospitals have capacity, . . . and Pennsylvanians are largely complying with the COVID-19 precautions".[25] *Doc. 4, ¶*9. Plaintiffs, none of whom are public-health professionals, also opine that "COVID-19 is nothing more than a mild viral illness like the flu . . ." and that the Governors' Orders are "harming [the public's] immune systems by weakening it and making them more susceptible to contract viral illnesses. *Doc. 4, ¶*9. *See also, Doc. 5* at 23. They conclude that "COVID-19 poses a risk of serious harm or death to an infinitesimally small percentage of Pennsylvanians in certain demographic groups." *Doc. 4, ¶*9. This demonstrates a callous disregard for the dangers of this virus and the lives it has taken.[26] As of May

---

[25]    Plaintiffs' Brief in Support does not contain any argument with respect to the issue of whether an injunction will harm the Defendants.   Rather, Plaintiffs incorporate their argument by reference in violation of L.R. 7.8(a).

[26]    Plaintiffs' comparison of COVID-19 to a "mild disease" like the influenza actually undermines their position. Between 24,000 and 62,000 Americans died from influenza in during the 7-month 2019-2020 flu season. https://www.cdc.gov/flu/about/burden/preliminary-in-season-estimates.htm    (last

16, 2020, 4,403 Pennsylvanians have died from the virus.[27] Plaintiffs are willing to sacrifice more lives in their own financial interest.

The Governor's Orders were enacted for the sole purpose of protecting the lives of citizens of the Commonwealth and were issued only after less-restrictive measures proved ineffective at preventing the spread of COVID-19. Only after those options were exhausted did Governor Wolf issue orders closing businesses which are not life-sustaining[28] and requiring citizens to stay at home to "lessen the curve" of the disease. These steps were necessary to protect and preserve human life in Pennsylvania.

The issuance of the restraining order Plaintiffs seek here will not merely harm the public, it will actively contribute to the spread of COVID-19, causing the unnecessary suffering and death of countless more Pennsylvanians. Plaintiffs contend that there is no risk of COVID-19 at their businesses. *Doc. 4, ¶9.* This unscientific belief ignores that between 25% and 50% of individuals infected with

---

visited 5/17/20). Yet, in less than two months, nearly 90,000 Americans have died from COVID-19, with that number rising daily.

[27]    https://www.media.pa.gov/Pages/Health-Details.aspx?newsid=812

[28]    All Non-Life-Sustaining Businesses in Pennsylvania to Close Physical Locations as of 8 PM Today to Slow Spread of COVID-19, https://www.governor.pa.gov/newsroom/all-non-life-sustaining-businesses-in-pennsylvania-to-close-physical-locations-as-of-8-pm-today-to-slow-spread-of-covid-19/ (3/19/20).

the virus are asymptomatic, and that the disease has an incubation period of up to 14 days. *Doc. 1-2* at 27. As the Pennsylvania Supreme Court explained, Plaintiffs' "argument ignores the nature of this virus and the manner in which it is transmitted. . . . [A]ny location (including [Plaintiffs'] businesses) where two or more people can congregate is within the disaster area." *Id*. There can be no greater adverse effect on the public than the additional, unnecessary deaths of its individual members. That effect, alone, mandates denial of the temporary restraining order.

## **CONCLUSION**

Defendants respectfully request that this Honorable Court deny Plaintiffs' Motion for a Temporary Restraining Order.

Respectfully submitted,

JOSH SHAPIRO
Attorney General

BY:   */s/ Keli M. Neary*

Office of Attorney General
15th Floor, Strawberry Square
Harrisburg, PA  17120

KELI M. NEARY
Executive Deputy Attorney General
Attorney ID 205178

Date:  May 17, 2020

*/s/ Karen M. Romano*
KAREN M. ROMANO
Chief Deputy Attorney General
Attorney ID 88848

*/s/ Nicole J. Boland*
NICOLE J. BOLAND
Deputy Attorney General

_____

Attorney ID 314061

*Counsel for Defendants*

## CERTIFICATE OF SERVICE

I, Karen M. Romano, Chief Deputy Attorney General, do hereby certify that

I have this day served the foregoing **Defendants' Brief in Opposition to Plaintiffs'**

**Motion for a Temporary Restraining Order**, via ECF, on the following:

> Marc A. Scaringi, Esquire
> Brian Caffrey, Esquire
> SCARINGI LAW
> marc@scaringilaw.com
> brian@scaringilaw.com
> *Counsel for Plaintiffs*

 /s/ Karen M. Romano
KELI M. NEARY
Chief Deputy Attorney General

Date:  May 17, 2020

# <u>CERTIFICATE OF PAGE COUNT</u>

I hereby certify that, in conformance with the provisions of Local Rule 7.8(b)(2) and the page-count extension authorized by the Court, the substantive portion of this brief contains 45 pages or less.

*/s/ Karen M. Romano*

KAREN M. ROMANO
Chief Deputy Attorney General

DATE:  May 17, 2020